**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Larry PETERMAN, Defendant–Appellant.**

No. 85–1993.

United States Court of Appeals, Tenth Circuit.

March 10, 1988.

Rehearing Denied June 7, 1988.

**3.** We note, however, that if the lease had terminated by the time this notice was given, and if forfeiture of the lease cannot be avoided, the giving of the notice is irrelevant.

Jerome H. Mooney of Mooney & Smith, Salt Lake City, Utah, for defendant-appellant.

Francis Leland Pico, Asst. U.S. Atty., Cheyenne, Wyo. (Richard A. Stacy, U.S. Atty. and Lisa E. Leschuck, Asst. U.S. Atty., with him on the brief), for plaintiff-appellee.

Before SEYMOUR, REINHARDT,[*] and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Larry Peterman appeals from his conviction for wire fraud and conspiracy to commit wire fraud. He also appeals from the enhancement of his sentence by the district court. We affirm the conviction, but because of the lack of findings, we remand for resentencing.

Peterman was the founder of "Meat Masters," a chain of stores that sold sides of beef and other large quantities of meat to the public. Meat Masters stores were located in Utah and Wyoming. The stores advertised their products on Salt Lake City and Cheyenne television stations and in print media throughout the area. Consumers were instructed to call a toll-free telephone number to arrange appointments for the purchase of meat. Over 400 consumers bought meat from Meat Masters through its stores in Casper, Cheyenne, and Eden, Wyoming.

Peterman and other Meat Masters employees were indicted for consumer fraud arising from the sale of meat in the stores in Wyoming. The nine defendants were charged with various fraudulent practices in the advertising and sale of meat in violation of the wire fraud provisions of 18 U.S.C. § 1343. Peterman and three other defendants were convicted in a trial in 1981. This court reversed Peterman's conviction because of the district court's failure to give a good faith instruction to the jury. *United States v. Hopkins,* 744 F.2d

---

* The Honorable Stephen R. Reinhardt, United States Court of Appeals for the Ninth Circuit,

716 (10th Cir.1984) (en banc).[1] Peterman was again convicted in 1985 and sentenced to three years in prison.

Peterman brings four allegations on appeal: (1) the district court's instructions to the jury expanded the scope of the indictment, (2) the court erred in allowing the government to introduce evidence of the 1981 conviction of one of Peterman's original codefendants, (3) the court erred in allowing the prosecution to read parts of Peterman's testimony from the 1981 trial into the record, and (4) the court improperly enhanced the sentence.

## I.

Peterman alleges that the district court's instructions to the jury improperly expanded the scope of the indictment. In particular, Peterman contends that the court's definition of "bait and switch" tactics allowed the jury to reach a guilty verdict on the basis of a theory not relied upon by the grand jury in delivering the indictment.

Jury instructions may not include an element of an offense if that element was not charged in the indictment. *United States v. Sloan,* 811 F.2d 1359, 1363 (10th Cir. 1987). The court in *United States v. Lemire,* 720 F.2d 1327, 1344 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984), noted two dangers that arise from a substantial deviation of instructions from an indictment. First, a defendant is required to answer to a charge that was not brought by a grand jury, thus violating the express language of the fifth amendment that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." Second, a defendant is denied suffi-

cient notice to present and prepare an adequate defense to the crime charged. Nevertheless, instructions necessarily deviate somewhat from an indictment because instructions explain to a jury how the law relates to the facts presented at trial. Therefore, instructions will be found invalid only if their deviation from the indictment infringes on a defendant's rights. *Lemire,* 720 F.2d at 1344; *see also Sloan,* 811 F.2d at 1362–63.[2]

■ Count one of the indictment charged Peterman with "using deceptive sales techniques and making false representations to victim-consumers." The indictment alleged that "different consumer-victims were deceived in varying ways," including "the use of 'bait and switch' tactics, in which the Defendants persuaded consumers to purchase more expensive cuts of meat than those advertised, by making the advertised cuts either unavailable or so unattractive in appearance that no reasonable consumer would purchase them." The indictment then recited several overt acts that Peterman had allegedly committed, such as "provid[ing] certain advertised items of bonus meats which were green and moldy," failure to provide consumers with promised bonus meat, selling "a quantity of spoiled pork that was part of the bonus package," and selling meat to one customer with "an estimated cutting loss of 47%, and ... overcharg[ing] him] an additional 20¢ per pound, for 'custom cutting', contrary to the representations of the Defendants." The indictment identified twenty-one specific instances in which the defendant had sold or participated in the sale of meat in furtherance of the charged offense.

The court instructed the jury as follows:

sitting by designation.

1. In another case this court affirmed the order of the Secretary of Agriculture finding Peterman guilty of deceptive trade practices and imposing a $20,000 penalty. *Peterman v. United States Dept. of Agriculture,* 770 F.2d 888 (10th Cir.1985).

2. We held the variance between the indictment and the instructions in *Sloan* to be prejudicial. The indictment alleged that the defendant "un-

lawfully seized, abducted, confined and kidnapped" his victim. 811 F.2d at 1361. As we noted on review, "the court instructed the jury that '[w]hoever unlawfully seizes, confines, *inveigles, decoys,* kidnaps, or carries away ... any person' is guilty of violating 18 U.S.C. § 1201." *Id.* at 1363 (emphasis original). The addition of the terms "inveigles" and "decoys" was prejudicial in *Sloan* because "the testimony of the victim was equivocal regarding the use of force." *Id.*

Count 1 of the indictment charges as a part of the conspiracy to defraud, that bait and switch tactics were used by the defendant in the operation of various Meat Masters stores.

Under Wyoming law, a person engages unlawfully in a deceptive trade practice when he knowingly in the course of his business and in connection with a consumer transaction engages in bait and switch advertising.

Bait and switch advertising consists of an offer to sell merchandise, which the seller doesn't intend to sell, which advertising is accompanied by one or more of the following practices:

A. Refusal to show the merchandise advertised; or

B. False disparagement in any material respect to the advertised merchandise or the terms of sale; or

C. Requiring undisclosed tie-in sales, or other undisclosed conditions to be met prior to selling the advertised merchandise; or

D. Knowingly showing or demonstrating defective merchandise, which is unusable or impractical for the purpose set forth in the advertisement; or

E. Accepting a deposit for the merchandise and subsequently charging the buyer for a higher priced beef item without his consent, or

F. Willful failure to make either deliveries of the merchandise or to make a refund therefor.

Even assuming that part of the definition of bait and switch in the jury instructions diverged from the activities alleged in the indictment, no evidence was offered at trial to prove the offenses described in the objectionable parts of the instructions. Instead, the evidence produced at trial was consistent with the activities the government alleged in the indictment.

Fourteen consumers who had purchased meat from Meat Masters testified against Peterman at trial. Their testimony was strikingly consistent. They described a pattern of sales tactics that shows that this was perhaps the classic "bait and switch" case.

A prospective consumer learned of Meat Masters through advertisements for meat priced at 97¢, 99¢, $1.04, $1.09, or $1.29 per pound. The consumer then called Meat Masters on its toll free telephone number to arrange an appointment at one of its stores. Upon arrival at the store, the consumer would be asked if he or she had ever purchased meat in bulk quantities before. Most consumers answered "no." The sales representative would then show the consumer the meat. First, the consumer would see the meat available at the sale price. It was variously described as "kind of gray and brown and kind of had a green tinge to it," "pretty dried out," "pretty fatty," "really dark," "terrible" and "kind of grayish color," having "tendons coming ... through it," and "really gross." The sales representative would then show the consumer another cut of beef which looked "real nice," "really attractive," "fresher," "a lot better," "real appealing," or "a hundred percent better." This meat, however, was priced at $2.39, $2.45, $2.49, $2.67, or $2.87, per pound. The representative would then attempt to convince the consumer that the more expensive meat afforded a better buy because there was less waste than the sale meat. The consumer would agree to purchase the more expensive meat.

In a few instances there were variations from the general pattern. In one instance, the representative told the consumer that he could not sell the sale meat, despite the consumer's desire to purchase it, because it must be kept available for other consumers who might wish to purchase it. Several consumers also complained that the advertised bonus items—such as chickens, ham, bacon, or pork chops—that were promised free for the purchase of meat were unavailable.

Thus, the evidence produced at trial closely corresponds to the offense initially described in the indictment. There is no evidence in the record which would have allowed the jury to convict Peterman of an offense that was not charged in the indictment. We therefore hold that the district

court's instructions to the jury did not constitute prejudical error.

## II.

■ Peterman raises several challenges to the admissibility of evidence that Mark Lundquist, who had managed Meat Masters stores in Eden and in Casper, was convicted in the first trial in this matter. Lundquist was a codefendant of Peterman in the 1981 trial, during which Lundquist denied his involvement in the illegal activities alleged in the indictment. Lundquist was convicted and did not appeal. The government called Lundquist as a witness against Peterman in this trial. When Lundquist began to testify favorably to Peterman, the prosecutor sought to impeach Lundquist through evidence of his prior conviction. The district court allowed the impeachment over Peterman's objection.

### A.

■ The admissibility of testimony regarding the conviction of a codefendant depends on the purpose for which such evidence is offered. The government may not introduce evidence of a codefendant's conviction as substantive evidence of the guilt of the defendant who is on trial. *United States v. Davis,* 766 F.2d 1452, 1456 (10th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985); *United States v. Baez,* 703 F.2d 453, 455 (10th Cir.1983). If the codefendant testifies, however, evidence of a prior conviction is admissible to impeach the credibility of the witness. *Davis,* 766 F.2d at 1456; *Baez,* 703 F.2d at 455. Moreover, pursuant to Fed.R.Evid. 607, the government is allowed to impeach the testimony of a codefendant

even though the government itself called the codefendant as a witness.

Evidence of the conviction of a codefendant, then, may be used for impeachment but may not be used to establish the guilt of the defendant. The possibility of an effort to offer evidence of a conviction ostensibly for impeachment but with the true intent of admitting substantive evidence of guilt requires us to examine the purpose of the government in calling a codefendant. As Judge Posner has observed,

> [I]t would be an abuse of [Rule 607], in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it.

*United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984). Thus, we have said that "a prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *United States v. Silverstein,* 737 F.2d 864, 868 (10th Cir.1984).[3] In evaluating the reason a witness is called, we adopt the rule of the Fifth Circuit that the prosecution may not introduce evidence "under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." *United States v. Hogan,* 763 F.2d 697, 702 (5th Cir.1985) (quoting *United States v. Miller,* 664 F.2d 94, 97 (5th Cir.1981), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982)) (emphasis original).

---

**3.** Every circuit has said evidence that is inadmissible for substantive purposes may not be purposely introduced under the pretense of impeachment. *United States v. Frappier,* 807 F.2d 257, 259 (1st Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987); *United States v. Johnson,* 802 F.2d 1459, 1466 (D.C.Cir.1986); *Balogh's of Coral Gables, Inc. v. Getz,* 798 F.2d 1356, 1358 n. 2 (11th Cir.1986) (en banc); *United States v. Sebetich,* 776 F.2d 412, 429 (3d Cir.1985); *United States v. Hogan,* 763 F.2d 697, 701–03 (5th Cir.1985); *Webster,*

734 F.2d at 1192; *United States v. Crouch,* 731 F.2d 621, 624 (9th Cir.1984), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 778, 83 L.Ed.2d 773 (1985); *United States v. Fay,* 668 F.2d 375, 379 (8th Cir.1981); *United States v. DeLillo,* 620 F.2d 939, 946 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 107, 66 L.Ed.2d 41 (1980); *United States v. Morlang,* 531 F.2d 183, 189–90 (4th Cir.1975); *United States v. Dye,* 508 F.2d 1226, 1234 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975).

■ Peterman contends that the government called Lundquist for the sole purpose of impeaching him with evidence of his prior conviction. The decisive issue for us is what the government expected Lundquist to say.[4] In the hearing on his motion for mistrial, Peterman offered an affidavit from Lundquist asserting that the government knew Lundquist intended to maintain his innocence, just as he had testified in the 1981 trial. The government, however, advances two explanations for why it expected Lundquist to testify differently than he had in 1981. First, the government suggests that it thought that Lundquist would admit that he had engaged in the activities for which he had been convicted because the jury had not believed Lundquist's testimony at trial. Were this the only basis for the government's belief that Lundquist would change his testimony, the government's argument would fail. A defendant cannot be expected to freely admit guilt simply because he or she has been convicted. In this case, however, the government had a second, legitimate reason for expecting Lundquist to testify differently than he had in 1981. The prosecutor and a USDA special agent indicated that they had met with Lundquist before trial and expected that Lundquist would modify his original testimony and admit that he had engaged in the activities alleged in the indictment. Lundquist, however, insisted that he had informed the government that he would not change his story. Faced with these conflicting accounts, the district court found the prosecutor and the USDA agent credible and found Lundquist not credible. In its order denying Peterman's motion for a mistrial, the court found as follows:

> [T]he Court has had opportunity to view and consider Mr. Lundquist's demeanor and manner while on the witness stand and finds that Mark Lundquist is not a believable or a credible witness. When faced with conflicting testimony on the matter, the Court is persuaded to believe the statements of Mr. Pico and Mr. Ack-

erman. The Court believes the plaintiff was surprised by the testimony of Mr. Lundquist. Therefore, there was no prosecutorial misconduct, and his impeachment by proof of his convictions was proper.

The court also found that defense counsel had met with Lundquist the night before the government called him as a witness and had "in some way influenced him." This supports the government's contention that it was surprised by Lundquist's testimony.

Evaluating the credibility of witnesses is uniquely within the expertise of the trial court. Based on the factual findings by the trial court regarding the relative credibility of the witnesses, we cannot say the court erred in determining that the prosecutor did not call Lundquist with the primary purpose of introducing evidence of his prior conviction.

### B.

■ Peterman also objected to the evidence of Lundquist's prior conviction as unduly prejudicial and thus inadmissible pursuant to Fed.R.Evid. 403. The district court has broad discretion in determining whether the probative value of evidence is substantially outweighed by its prejudicial impact. *United States v. Chalan,* 812 F.2d 1302, 1308 (10th Cir.1987).

The danger of unfair prejudice arising from evidence of the prior conviction of a codefendant is obvious: a jury may be tempted to conclude that if one defendant is guilty of committing an offense, the other defendant is guilty as well. "A guilty plea entered by a codefendant can be especially prejudicial if the plea is made in connection with a conspiracy to which the remaining defendants are charged." *United States v. DeLucca,* 630 F.2d 294, 298 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981); *see also United States v. Christian,* 786 F.2d 203, 214 (6th Cir.1986). The district court here, however, was careful to restrict the

---

4. Peterman denies that Lundquist's testimony could have added anything to the government's case that had not already been obtained from other witnesses. In essence, Peterman is disput-

ing what Lundquist would have said. If Lundquist had testified as the government expected him to testify, such evidence would certainly have added to the government's case.

prosecutor's impeachment of Lundquist to minimize the danger of prejudice. Indeed, the court screened the questions that the prosecutor asked Lundquist to assure they contained no references to Peterman. Having carefully reviewed the record on this issue, we conclude that the district court did not abuse its discretion in denying the objection to evidence of Lundquist's prior conviction as unfairly prejudicial.

### C.

■ Peterman argues that the court erred in not instructing the jury that evidence of Lundquist's prior convictions could be used only to impeach Lundquist's credibility and not as substantive evidence of Peterman's guilt. The government asserts that the court did give a proper cautionary instruction, but the cited instruction related to the effect of a prior conviction on the credibility of a witness rather than the permissible narrow use of evidence of a prior conviction. We have said that "cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical." *Baez*, 703 F.2d at 455. Peterman, however, did not request a cautionary instruction for this purpose. Thus, we will reverse on this basis only if there was plain error affecting Peterman's substantial rights. *See* Fed.R.Crim.P. 52(b).

This court has had several occasions recently to decide whether the failure to give a cautionary instruction regarding the use of a codefendant's prior conviction is plain error. In *Baez*, we held that the district court's reference to the guilty pleas of two codefendants amounted to plain error because of the failure to give a limiting instruction, and, "[e]ven more serious[ly]," because one of the codefendants never testified at trial. 703 F.2d at 455. Further, "[t]he only significant Government witness" against the defendant "was an informer ... who had regularly used drugs for thirteen years." *Id.* at 456. In *Davis*, we held there was no plain error because of the appellant's effective use of his codefendants' guilty pleas and because of the "significant evidence of appellant's guilt."

766 F.2d at 1455–57. In *United States v. Austin*, 786 F.2d 986, 992 (10th Cir.1986), we held there was plain error because "the significant evidence against [the appellants] had been supplied by coconspirators who had been given or were to receive favorable treatment from the Government in return for their testimony." In *United States v. Smith*, 806 F.2d 971, 974–75 (10th Cir.1986), we again stressed that the government's case came from coconspirators who had pleaded guilty, and we considered the prosecutor's arguments, to the effect that "birds of a feather flock together," in concluding there was plain error.

Our review of the record in light of these decisions convinces us that the failure to give a cautionary instruction in this case was not plain error. Lundquist was only one of many witnesses who testified about Peterman's activities with Meat Masters. Here, unlike *Smith* and *Austin*, very little of the evidence against the defendant came from the contested witness. Twenty-eight witnesses testified for the government, including thirteen consumers and an undercover USDA agent who had purchased meat from Meat Masters, and another former associate of Peterman who had been a codefendant in the 1981 trial. It is also significant that the reference to Lundquist's prior conviction was isolated and not repeated by the prosecutor at any other point of the trial. In view of all of these circumstances, we hold there was no plain error.

### III.

■ Peterman alleges that the prosecutor committed reversible error by reading statements made by Peterman in his first trial in an effort to impeach Peterman's testimony in this trial. He objects to two lines of questioning that the prosecutor pursued in cross examination at the first trial: first, the prosecutor in the 1981 trial asked Peterman about his involvement in the meat industry prior to the events specified in the indictment, and second, the prosecutor asked Peterman some questions about his family. According to Peterman, both inquiries were improper cross-exami-

**1482**

nation, and the use of testimony from the first trial in the second trial constitutes reversible error.

Even assuming that the cross-examination in the first trial was improper, the alleged error in no way affected the trial we are now reviewing. The brief sections of Peterman's 1981 testimony that the prosecutor relied upon in this trial related only to Peterman's activities with Meat Masters. The prosecutor did not use any of the challenged testimony from the 1981 trial—questions concerning Peterman's involvement in the meat industry before the formation of Meat Masters and questions concerning Peterman's family—during the retrial. The jury never heard any of the alleged improper testimony from the first trial. We therefore conclude there is no basis for asserting any error in the prosecutor's cross examination of Peterman in this trial.

## IV.

Peterman challenges the enhancement of his sentence after the second trial. He contends that the trial court relied on inaccurate information in the presentencing report and that he was deprived of a reasonable opportunity to refute the alleged misinformation. He also cites as error the court's failure to make findings of fact regarding the disputed facts in the presentence report. As explained below, we remand for resentencing so that the court may make findings.

We have held that "[w]ith few limitations, a court has almost unlimited discretion in determining what information it will hear and rely on in imposing sentence." *United States v. Graves*, 785 F.2d 870, 872 (10th Cir.1986). Indeed, the Supreme Court has indicated that, contrary to Peterman's contention, a presentence report "may rest on hearsay." *Gregg v. United States*, 394 U.S. 489, 492, 89 S.Ct. 1134, 1136–37, 22 L.Ed.2d 442 (1969). However, the court's very broad discretion in the sentencing process is limited by two separate requirements that are implicated in this case.

The first requirement stems from the enhancement of Peterman's sentence on retrial. A trial judge may impose a greater sentence on retrial than he had originally imposed, "in the light of events subsequent to the [defendant's] first trial." *North Carolina v. Pearce*, 395 U.S. 711, 723, 89 S.Ct. 2072, 2079, 23 L.Ed.2d 656 (1969). However, when a defendant's original sentence is increased upon reconviction in a new trial by the same sentencer, the record must affirmatively reflect the sentencer's reasons for enhancement. *Id.* at 726, 89 S.Ct. at 2081–82; *Texas v. McCullough*, 475 U.S. 134, 106 S.Ct. 976, 980, 89 L.Ed.2d 104 (1986). The requirement of a record that articulates reasons for a higher sentence protects a defendant by alleviating the fear of a vindictive reprisal by a trial judge after a successful appeal of the defendant's first conviction. *Id.* 106 S.Ct. at 979. This requirement is satisfied here. The record reveals that the court's reason for imposing a higher sentence was its belief that Peterman had engaged in criminal conduct subsequent to his first conviction. Furthermore, Peterman makes no claim of vindictiveness, nor do we find anything in the record suggesting that the court's decision was based on improper motives. The requirement of *Pearce* is therefore satisfied. *See McCollough*, 106 S.Ct. at 979 (citing the holding in *Moon v. Maryland*, 398 U.S. 319, 90 S.Ct. 1730, 26 L.Ed. 2d 262 (1970), that "*Pearce* did not apply when the defendant conceded and it was clear that vindictiveness had played no part in the enlarged sentence.").

The second requirement implicated here is that there be a record which is adequate to allow the reviewing court to determine whether the sentencer relied on accurate information. Fed.R.Crim.P. 32(c)(3)(D) provides:

If the comments of the defendant and his counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is neces-

sary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

The Seventh Circuit explained the need for a record of the determination of factual disputes:

> For example, if the court finds that information in the report is unreliable or simply decides not to rely on the disputed facts in sentencing, by following Rule 32(c)(3)(D) that decision will become part of the presentence report. This reduces the likelihood of later decisions being made on the basis of improper information. Moreover, if the record does not clearly reflect whether or not the information was relied on, appellate courts or prison officials may make incorrect assumptions about the disposition of alleged inaccuracies. Thus a court that fails to follow Rule 32(c)(3)(D) may not necessarily violate a defendant's right to due process; nonetheless, a violation of the rule could require a remand for resentencing.

*United States v. Eschweiler,* 782 F.2d 1385, 1387–88 (7th Cir.1986) (citations omitted).

Because of the lack of findings by the court, we are unable to determine whether the court relied on unreliable information. Nor are we able to determine whether the court abused its discretion in failing to hold an evidentiary hearing. We therefore follow the procedure used by the court in *United States v. Petitto,* 767 F.2d 607, 611 (9th Cir.1985), and remand for resentencing. *See also United States v. Golightly,* 811 F.2d 1366 (10th Cir.1987); *United States v. Bradley,* 812 F.2d 774, 781–82 (2d Cir.), *cert. denied,* —— U.S.——, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987); *United States v. Manni,* 810 F.2d 80, 82–84 (6th Cir.1987); *United States v. Edwards,* 800 F.2d 878, 880–84 (9th Cir.1986); *Eschweiler,* 782 F.2d at 1390–91; *United States v. Velasquez,* 748 F.2d 972, 973–75 (5th Cir.1984).

At the sentencing hearing in this case, Peterman objected to several facts presented in the original presentence report as well as the updated report reflecting Peterman's activities between his first and second trials. The transcript of proceedings shows the court did not make findings as to each disputed contention upon which it relied. Specifically, Peterman argued the presentence report was inaccurate when it implied Peterman engaged in bait and switch tactics in stores in New Mexico, Arizona, and in two other stores in Utah. Peterman's objections called the court's attention to the specific and separate instances of wrongdoing in the report and precisely spelled out the Peterman version of each allegation. The trial court's only reference to the disputed facts is the following:

> [T]he real problem that I've got is that I gave you two years last time and you went out and did it again and it didn't seem to deter you in any way.... It is the finding of this court that there are grounds on which the sentence can be enhanced....

The district court did not make the findings or determination required by Rule 32. The presentence report contained allegations that after defendant's 1981 conviction, he was involved in four other bulk meat bait and switch operations in Layton and Salt Lake City, Utah; Flagstaff, Arizona; and Farmington, New Mexico. Peterman takes issue with each of these allegations. The trial court should have made a specific finding regarding each of the four allegations or should have made a determination that it would not rely on them. It then should have attached to the presentence report a written record of those findings or determinations. This is not an onerous burden. As the Advisory Committee to Rule 32(c)(3)(D) pointed out, "[the Rule] does not even require the preparation of a transcript. As is now the practice in some courts, these findings and determinations can be simply entered onto a form which is then appended to the [presentence] report." Notes of Advisory Committee on Rules, *reprinted in* 18 U.S.C.A. following Rule 32 (West Supp. 1985). Alternatively, if a transcript is prepared, a copy may be attached

to satisfy the requirement of a written record. *Poor Thunder v. United States,* 810 F.2d 817, 826 (8th Cir.1987).

On remand, the district court should provide a written record of its finding as to any of the four allegations disputed by Peterman and upon which it relies and attach this record to the presentence report.

At least two circuits have indicated that the scope of a remand in cases like the present differs depending upon the disposition of the factual discrepancies. The Seventh and Second Circuits have said that they will not require resentencing when the record is clear that the trial judge did not rely upon the contested facts but instead will remand solely to require the district court to perform the ministerial duty of attaching a written record to the presentence report. *Eschweiler,* 782 F.2d at 1390–91; *Bradley,* 812 F.2d at 782.

The record here clearly reflects that the trial court relied on at least one of the presentence report's allegations of Peterman's interim misconduct. Because it did not make a specific finding as to each of the disputed allegations or determine that it would not rely on them, resentencing is required in this case.

■ Because there will be another sentencing proceeding, we deem it appropriate to address Peterman's contention that the court is required to hold an evidentiary hearing to resolve the factual discrepancies. Rule 32(c)(3)(A) provides:

At a reasonable time before imposing sentence, the court shall permit the defendant and his counsel to read the report of the presentence investigation.... The court shall afford the defendant and his counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

The clear language of this rule provides that a defendant must be given an opportunity to "comment on the report" but that the decision of whether to hold an evidentiary hearing is within the discretion of the trial court. Peterman suggests that given

our holding in *United States v. Jones,* 640 F.2d 284 (10th Cir.1981), effective rebuttal necessarily requires a hearing. In *Jones* we held that there is "a due process right to be sentenced only on information which is accurate." *Id.* at 286. However, in *United States v. Shepherd,* 739 F.2d 510, 515 (10th Cir.1984), we explained that "*Jones* stands for the proposition that a defendant has the right to rebut or explain allegations made in a sentencing proceeding, not that the government must prove the allegations beyond a reasonable doubt." It is clear that "[d]ue process does not mandate an evidentiary hearing." *United States v. Papajohn,* 701 F.2d 760, 763 (8th Cir.1983).

During Peterman's sentencing hearing, both Peterman and his counsel were given opportunity to comment at length on the presentence report. Peterman was also allowed to file several affidavits and items of evidence. "[D]uring the resentencing procedure the court may decide whether any additional opportunity to respond is required, and by what means." *Petitto,* 767 F.2d at 611. While Peterman must be given an opportunity to explain why he believes the presentence report was incorrect, the scope of the procedure for rebuttal lies within the sound discretion of the trial judge in "balancing the need for reliability with the need to permit consideration of all pertinent information." *Papajohn,* 701 F.2d at 763 (quoting *Orner v. United States,* 578 F.2d 1276, 1279 (8th Cir.1978)).

AFFIRMED IN PART AND REMANDED IN PART.