**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DEMONTE HOWARD EMBRY,

Defendant-Appellant.

No. 11-5027

(N.D. of Okla.)

(D.C. No. 4:10-CR-00056-CVE-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **McKAY**, and **TYMKOVICH**, Circuit Judges.[**]

---

Demonte Howard Embry was convicted of being a felon in possession of a

firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2),

and sentenced to seventy-seven months incarceration.

Embry presents two issues for review. First, whether a magistrate judge

abused his discretion in denying Embry's discovery request for potentially

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

exculpatory and impeaching FBI information.  Second, whether the district court erred in preventing Embry from impeaching his own witness on direct examination with extrinsic evidence of the witness's efforts to discredit a government witness in an unrelated police corruption case.  We find no error in either ruling.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I.  Background

Two members of the Tulsa Police Department's (TPD) Gang Unit, Officer Mark Wollmershauser and Corporal Brian Blair, were patrolling near the Seminole Hills apartments in Tulsa, Oklahoma.  The patrol was part of a series of directed patrols due to the area's reputation as a high crime area.  After circling through the complex, the officers chose to stop and approach a group of four men.

According to Wollmershauser's testimony, as the officers exited their vehicle and approached the men, one of the men, Embry, removed a dark colored handgun from the pocket of his hooded sweatshirt, leaned down behind a vehicle, and then emerged with the gun no longer in his hand.  After Embry stood back up, Wollmershauser began to rapidly approach him, concerned Embry may take off running, creating a dangerous situation for Blair and himself.  Wollmershauser testified he did not actually see the gun drop from Embry's hands, but that he did hear a loud "clank noise as if a metal object hitting the pavement" after observing the gun in Embry's hands for "about two seconds."  R., Doc. 113 at 25–26.  Upon

reaching Embry, Wollmershauser pulled Embry down to the ground, ordered the other men to lay on the ground, and then handcuffed Embry. Upon handcuffing Embry, Wollmershauser recovered the handgun and placed Embry under arrest.

Wollmershauser then picked up the gun—without using any gloves —unloaded it and placed it inside his police vehicle, locking the door behind him. Wollmershauser testified that quickly removing the gun from the situation "was the fastest thing that I could extricate out of the situation to at least make us safer somewhat." *Id.* at 28. In defending his decision not to use any gloves, he testified: "[i]t wasn't a secure crime scene. . . . it was a rapidly evolving situation" involving multiple threats to the two officers on scene. *Id.* at 31. Subsequent examination showed, when the gun was picked up, it contained two rounds in the magazine and an additional round in the chamber. Importantly, in his police report, Wollmershauser did not include the names of the other three men because they "didn't possess a gun that day," and "weren't involved in any criminal activity." *Id.* at 49.

Once Embry was transported to the police station, a routine search determined he was a convicted felon. Accordingly, a federal grand jury charged Embry with possessing a firearm and ammunition after a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

As part of discovery, Embry moved for disclosure of exculpatory and impeaching evidence from the government, requesting substantial information

regarding the TPD and its officers. The district court judge referred this matter to a magistrate judge. At the hearing, the government represented to the court that it had turned over all of the information in its possession to Embry's counsel. Embry's counsel also requested the police logs and radio traffic records from the time surrounding the arrest. The prosecutor told the court that no logs were available, but agreed to make inquiries with the relevant agencies. Based on these representations, the magistrate judge concluded the discovery request was moot and entered a minute order to that effect. The government made no further representations prior to trial.

The case proceeded to trial on July 19, 2010. During a recess on the first day of trial, in response to a subpoena from Embry's counsel, the custodian of records for the TPD appeared and provided a police radio log containing the names of the three other men present during Embry's arrest. Embry promptly requested and was granted a mistrial "because the United States failed to follow up on its representation to Embry's counsel that it would inquire into the existence of audio recordings of the records check." R., Doc. 33 at 3.

Before the second trial began, the government filed a motion in limine requesting a prohibition against "any party, witness, or other person from making any reference to any investigation of members of the Tulsa Police Department for illegal conduct." R., Doc. 36 at 1. The district court granted the motion, finding that "misconduct by certain Tulsa Police Department officers is not relevant to

the issues in this case" since none of the investigating officers in Embry's case were subject to the probe. R., Doc. 42 at 1.

The second trial began on August 23, 2010. Officers Wollmershauser and Blair both testified they had seen Embry take a dark pistol from his pocket and squat down to place it on the ground. Embry presented testimony from the other three men present that day; all testified they did not see Embry with a gun at the relevant time. After several hours of deliberation, the jury announced it could not come to a verdict and was hopelessly deadlocked. After the parties agreed, the district court discharged the jury and set the case on its September jury trial docket.

The third trial began on September 22, 2010. As before, the two officers testified for the government, while the other three men present testified on Embry's behalf. The only new witness was a TPD forensic scientist who testified for the government. The forensic scientist testified that she found a partial fingerprint at the very front of the barrel of the gun, which appeared to be from a left thumb. She was able to exclude Embry as a potential source of the print, but concluded the print was consistent with both Wollmershauser and Blair. The location of the print was consistent with an officer having held the gun to unload it. After several hours of deliberation, the jury found Embry guilty. The district court ordered the preparation of a presentence report and scheduled sentencing for December 22, 2010.

On December 9, 2010, Embry filed a motion seeking access to:

1.    All FBI-302s in the possession of the United States which reference either Corporal Blair or Officer Wollmershauser;

2.    A copy of Corporal Blair's testimony in the matter of *United States v. Henderson and Yelton*; and

3.    A copy of the personnel files of Corporal Blair and Officer Wollmershauser.

R., Doc. 68 at 4. This motion came about after news reports surfaced that Blair had hurriedly left the courtroom to testify in a motion hearing as a defense witness for TPD officers Jeff Henderson and Bill Yelton, who were on trial as part of a wide-ranging corruption investigation involving the TPD. During the hearing, Blair, who worked with Henderson as a member of the Special Investigations Division, testified that: (1) he was friends with Henderson; (2) he acted on tips from Henderson to investigate people who could testify against him at Henderson's trial; and (3) after investigating people to help in Henderson's defense, questions were raised about Blair's actions prompting him to leave a note with Henderson's lawyer that he could no longer assist Henderson or Yelton. *Id.* at 3.

The district court referred the motion to a magistrate judge, who authorized Embry to order a copy of the transcript of Blair's testimony in the *Henderson* case, but denied the rest of the motion due to Embry's failure to establish a

specific evidentiary basis for his request.[1] Embry did not appeal the denial of his discovery motion.

While the discovery motion was pending, Embry filed a motion for a new trial, arguing that, had the jury been aware Blair was conducting investigations on his own time to assist other police officers accused of corruption, it was likely his testimony would have been discounted and Embry would have been acquitted. Embry also argued that, had the court known of Blair's involvement in the *Henderson* case, its ruling on the government's motion in limine regarding the TPD corruption investigation before the second trial, would have possibly been different. Additionally, Embry argued that Blair had assisted in the suppression of the names of the individuals with him at the time of his arrest and of the fingerprint evidence.

The district court agreed in part and granted Embry a new trial. Specifically, the district court held: while Embry had provided no newly discovered evidence that Blair suppressed information as to the identity of the witnesses or the fingerprint evidence, Embry had presented new evidence that Blair was friends with and engaged in independent investigations on behalf of officers charged with criminal conduct. The court continued: "the Court's decision is not a license to inquire into the entire investigation of the TPD or to

---

[1] While Blair's testimony was part of the public record of the case, Embry's counsel had exhausted his funds for transcripts in this case and was unable to order one without the court's approval.

seek additional discovery. Embry is limited to use of the transcript of Blair's testimony on September 22, 2010 to cross-examine Blair as to his assistance in the defense of Henderson and Yelton." R., Doc. 80 at 16 n.8.

In January 2011, the government filed a motion in limine to exclude the testimony of Blair if called by Embry in his case-in-chief, arguing that use of the *Henderson* hearing transcript would be inadmissible for purposes of substantive testimony and may not be presented solely for impeachment. Embry opposed the motion, arguing that, if the court granted the motion, he would be effectively barred from calling Blair as a fact witness.

The district court granted in part and denied in part the motion. The court granted the government's request to exclude testimony regarding Blair's testimony in support of Henderson and Yelton or any other information regarding the ongoing investigation of TPD officers. But the court denied the government's request to exclude Blair as a potential fact witness for Embry. In its discussion, the district court noted Embry was entitled to call Blair as a fact witness and was allowed to impeach the testimony of his own witness, but cautioned that a "party may not call a witness knowing the witness will not provide substantive testimony, but only to impeach the witness." R., Doc. 87 at 2 (quoting *United States v. Woody*, 250 F. App'x 867, 882 n.7 (10th Cir. 2007) (unpublished)).

Furthermore, the court observed that Federal Rule of Evidence 608(b) prohibits the use of extrinsic evidence of specific instances of conduct to attack a

witness's capacity for truthfulness, and that such instances may only be inquired into on cross-examination. The court also sanctioned the government's failure to disclose the information about Blair before Embry's third trial, in light of the strict requirements of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny. But the court continued: *Giglio* only applies "to impeachment information relating to a government witness," and is inapplicable where the government does not call the witness about whom impeachment evidence exists. R., Doc. 87 at 3. "The Court's previous instructions about Embry's ability to impeach Blair are therefore inapplicable if Blair is a witness for the defense. Information about Blair's testimony on behalf of Henderson and Yelton is not relevant to the facts of Embry's case, and may not be introduced by Embry through Blair as a witness." *Id.*

On January 18, 2011, Embry's fourth trial began. Neither Embry nor the government chose to call Blair to testify. Instead, the government called Wollmershauser to testify as to his version of the events leading to Embry's arrest. The government again called the TPD forensic scientist who testified similarly as in the third trial. Embry elected to call only one of the three men who was there at the time of the arrest. This witness testified as before, stating he had not seen a gun in Embry's possession at the time of his arrest. The jury found Embry guilty.

On February 16, 2011, the district court sentenced Embry to seventy-seven months imprisonment. This appeal followed.

## II. Discussion

Embry raises two arguments on appeal. First, he argues the magistrate judge erred in his decision to limit discovery of further exculpatory and impeaching information in response to his December 2010 motion. Second, he argues the district court erred in limiting the manner in which Embry would be allowed to impeach Blair's testimony during the fourth trial.

We address each in turn.

### A.    Discovery

Embry filed a motion seeking discovery of personnel files and FBI-302 reports pertaining to Wollmershauser and Blair, along with a copy of Blair's testimony in a separate case. As detailed above, the district court referred the motion to a magistrate judge, who ultimately authorized Embry to order a copy of the transcript of Blair's testimony in the *Henderson* case, but denied the rest of the motion due to Embry's failure to establish a specific evidentiary basis for his request.

### 1.    *Standard of Review*

A denial of a motion for discovery in a criminal case is reviewed for abuse of discretion. *United States v. Apperson*, 441 F.3d 1162, 1191 (10th Cir. 2006). The district court has abused its discretion when "its decision provides no rational

explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Gurung v. Ashcroft*, 371 F.3d 718, 720 (10th Cir. 2004) (internal quotation marks omitted).

But, as the government notes, Embry did not file timely written objections to the magistrate judge's opinion recommending the denial of his discovery motion. In so doing, the government asserts Embry waived his right to appeal the ruling and deprived this court of jurisdiction to hear the appeal. Despite the government having raised this issue in their brief, Embry does not respond or offer any explanation for his failure to do so in his Reply Brief.

We apply a "firm waiver rule when a party fails to object to the findings and recommendations of the magistrate." *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010) (internal quotation marks omitted). The rule provides that "the failure to make timely objection . . . waives appellate review of both factual and legal questions." *Id.* (quotation omitted). But two exceptions might apply: (1) when a *pro se* litigant has not been informed of the time period for objecting and the consequences of failing to object, or (2) when the "interests of justice" require. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quotation omitted).

Embry was represented by counsel throughout this case so the first exception is not applicable. In defining the scope of the "interests of justice" exception, we have said that, "in many respects, the interests of justice analysis

-11-

we have developed, which expressly includes review of a litigant's unobjected-to substantive claims on the merits, is similar to reviewing for plain error." *Duffield*, 545 F.3d at 1238 (internal quotation omitted). To show plain error, the defendant must show "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted). "[T]he failure to object to a magistrate judge's report and recommendation is really no different from, for example, the failure of counsel in open court to object to the admission of evidence." *Morales-Fernandez v. INS*, 418 F.3d 1116, 1120 (10th Cir. 2005) (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir. 1996)).

Accordingly, we will review Embry's motion under the interests of justice exception.

### 2. *Magistrate Judge's Ruling Was Not in Error*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty to disclose "extends to prosecutors, police, and other government investigators. Accordingly, a defendant may base a *Brady* claim on a government investigator's failure to disclose evidence material to guilt or punishment, even when the prosecutor

personally did not know of that evidence." *United States v. Velarde*, 485 F.3d 553, 559 (10th Cir. 2007) (internal quotations and citations omitted).

The two items Embry sought were: (1) all FBI-302 forms in the possession of the United States which reference either Wollmershauser or Blair and (2) a copy of the personnel files of Wollmershauser and Blair. Embry believed such evidence would be useful in impeaching the testimony of the officers and in corroborating the defense theory that the handgun had been planted. The magistrate judge denied this request, ruling that "the defendant has to show that further investigation under the Court's subpoena power very likely will lead to the discovery of evidence sufficient to support a new trial or at least . . . specific allegations that show reason to believe that the defendant may, if the facts are fully developed, be able to demonstrate that he's entitled to a new trial." R., Doc. 112 at 23. "In addition, there must be a firm evidentiary basis for believing such evidence likely exists, and discovery is not to be allowed if it is a mere fishing expedition based upon the defendant's mere hopes of finding exculpatory evidence." *Id.* The magistrate judge concluded that Embry lacked a firm evidentiary basis for the inquiry, and, in light of the government's representations to the court that none of the evidence sought was available, the request seemed likely to be moot.

Embry relies on the fact that additional exculpatory evidence existed earlier in this series of cases—notably the existence of the names of the witnesses

discovered during the first trial—to conclude there was a pattern of suppression that violated the government's obligation of disclosure. Accordingly, he argues granting his motion for post-trial discovery would work to remedy the pattern of suppression. Embry also argues this case is very similar to *Velarde* in that the defendant's guilt or innocence revolves around the credibility of a key witness and that a firm evidentiary belief already existed such that further discovery would "not be a mere fishing expedition." 485 F.3d at 561.

*Velarde* does not apply to the circumstances here. In *Velarde*, we classified the type of circumstances that post-trial disclosure applies to as "rare" and "limited." *Id*. at 560. The magistrate judge carefully considered *Velarde* and our cases applying it in making his decision before concluding: "I don't find that this is one of those rare class of cases." R., Doc. 112 at 23. The magistrate judge reiterated the government had a continuing duty to disclose exculpatory evidence and that if, despite its prior representations, it learned that material evidence, such as FBI-302s or other evidence existed, it had a duty to turn it over to Embry. *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) ("A *Brady* claim fails if the existence of favorable evidence is merely suspected. That the evidence exists must be established by the defendant.").

Nothing in Embry's appeal or in the record suggests Embry had a *sufficient* evidentiary basis the magistrate judge otherwise ignored. Even now, Embry simply asserts that since there had been evidentiary problems in the past,

there must have been evidentiary problems with disclosure at the time of his motion. This is simply not the case. We see no reason to reverse under the interests of justice exception.[2]

## B.    Impeachment

Prior to the fourth trial, the government filed a motion in limine asking the district court to exclude the testimony of Blair if called by Embry in his case-in-chief. The basis for the motion was the contention that use of the *Henderson* hearing transcript was irrelevant for purposes of substantive testimony supporting Embry's defense, and consequently could not be used solely for impeachment of Embry's own witness. The court granted the government's request to exclude testimony regarding Blair's testimony in support of Henderson and Yelton or any other information regarding the ongoing investigation of TPD officers, but denied the government's request to altogether exclude Blair as a potential fact witness for Embry. Ultimately, Blair was not called to testify by either side in the fourth trial.

### 1.    *Standard of Review*

The district court has broad discretion in determining the admissibility of evidence. We review questions concerning the admission of evidence under an

---

[2] It is worth pointing out that Embry was seeking this discovery as support for his motion for a new trial—a motion that was ultimately granted by the district court on the basis of Blair's testimony in the *Henderson* case (after receipt of the transcript as authorized by the magistrate judge). If there was any error here, it was harmless because Embry received the ultimate relief he sought.

abuse of discretion standard. We do not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law, or manifests a clear error in judgment. *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005) (internal quotation omitted). Whether the exclusion of evidence violates a defendant's Fifth and Sixth Amendment rights to present witnesses in his defense is a matter of law we review de novo. *Id.* "However, the right to present defense witnesses is not absolute. A defendant must abide the rules of evidence and procedure," including "standards of relevance and materiality." *Id.* (quoting *United States v. Bautista*, 145 F.3d 1140, 1151–52 (10th Cir. 1998)).

### 2. *Embry Was Allowed to Call Blair to Testify*

A brief review of the district court's reasoning clarifies the issue on appeal. The district court ruled that Embry was not to use the transcript of Blair's prior testimony in Henderson and Yelton's case solely to attack Blair's credibility. To support its conclusion, the court relied primarily on Rule 608(b), which provides: "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence." But, "on *cross-examination*," extrinsic evidence, "if probative of truthfulness or untruthfulness" may be inquired into. Fed. R. Evid. 608(b) (emphasis added). Thus, over the government's objection, the court allowed Embry to call Blair as a fact witness in his case-in-chief, with limitations

on the use of extrinsic evidence—the transcripts. Generally, however, "[i]nformation about Blair's testimony on behalf of Henderson and Yelton is not relevant to the facts of Embry's case, and may not be introduced by Embry through Blair as a witness." R., Doc. 87 at 3; *see also United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999) (*Giglio* requirements apply only to impeach information relating to a government sponsored witness).

Embry argues that the district court's order effectively hamstrung his case-in-chief in two ways. First, if Embry had called Blair as a witness, he would only have been able to impeach Blair if he testified in a manner inconsistent with his prior testimony (in either the prior trials in this case or in the *Henderson* case), and not by using his *Henderson* testimony to directly attack Blair's credibility because of his prior statements supporting the discredited officers.

As a threshold matter, the district court followed the proper procedure that follows from the Federal Rules of Evidence. Under the Rules, a party may attack the credibility of its own witnesses, and may use extrinsic evidence of prior inconsistent statements to do so. Fed. R. Evid. 607; 613(b). But before extrinsic evidence may be used, the witness must first testify in a manner inconsistent with his prior statements, and then must be afforded an opportunity to explain or deny the prior inconsistent statement. Fed. R. Evid. 613(b). As the district court recognized, Embry had every right to call Blair as a fact witness and, had he testified in a manner inconsistent with his prior statements (after giving him an

opportunity to explain or deny the prior statements), Embry would have been entitled to impeach him with any prior inconsistent statements. But Embry was not entitled to challenge Blair's otherwise consistent testimony in these trials solely with extrinsic evidence. *See also* 3 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 6:28 (3d ed. 2007) ("Impeachment by prior inconsistent statements cannot be allowed as a mere subterfuge to get before the jury evidence not otherwise admissible.") (internal quotation omitted).

Second, as a further effect of the district court's order, Embry argues he was unable to advocate that Blair planted the gun in question and falsely accused Embry of possessing it. According to Embry, by the time of the fourth trial, sufficient evidence had been developed from which a jury could conclude the handgun had been planted by Blair.

As to the general admissibility of Blair's prior testimony in the *Henderson* case, Embry argues the district court reached contradictory conclusions in its order regarding his motion for a new trial and its order under appeal here. In granting Embry's motion for a new trial, the district court stated: "a police officer's work to discredit a government investigation could also impact a jury's assessment of that officer's credibility and character for truthfulness in a case prosecuted by the government. And where, as here, the only witnesses against a defendant are police officers, anything that goes to their credibility is exculpatory and admissible." R., Doc. 80 at 13–14 (internal quotation omitted); *see also*

-18-

*Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432, 436 (10th Cir. 1981) (finding that a balance must be struck between the right to exculpatory material and an officer's right to privacy). Embry contends this statement cannot be reconciled with the court's later decision to exclude use of the *Henderson* testimony as direct impeachment evidence towards Blair's testimony. But a review of the court's two orders shows the district court was consistent in its belief that the *Henderson* testimony was only to be used *on cross-examination*, as permitted by the Federal Rules of Evidence. On this point, the district court was quite clear.

A party may not call a witness knowing he will not provide substantive testimony, but only as a means to impeach the witness with damaging prior statements. *United States v. Peterman*, 841 F.2d 1474, 1479 n.3 (10th Cir. 1988) (listing cases); *see also United States v. Buffalo*, 358 F.3d 519, 524 (8th Cir. 2004) ("a witness may not be impeached on a collateral matter by use of extrinsic evidence of prior inconsistent statements. . . . [but] only on a matter material to the substantive issues of the trial") (internal quotation omitted). While Embry acknowledges this point, he argues this was not his goal. Instead, he contends he faced a dilemma—had he called Blair as a witness, he "would have had to accept [Blair's] testimony as being truthful except to the extent that Corporal Blair had previously given sworn testimony which conflicted with his trial testimony." Aplt. Reply Br. at 3. This is correct, and again, follows from Rule 608. As a

matter of law, Embry was only able to raise the *Henderson* testimony on cross-examination—not as part of any direct examination.

Despite the plain language of the Rule, Embry points to our decision in *Patton v. Mullin*, where we held: "the rights to confront and cross-examine witnesses and to call witnesses in one's own behalf [are] essential to due process." 425 F.3d 788, 797 (10th Cir. 2005) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.").

While it is true that the right to confront and cross-examine witnesses is a fundamental aspect of due process, in this case the district court *denied* the government's motion to exclude the entirety of Blair's testimony and ruled that Embry was *allowed* to call Blair as a witness for the defense. Under the Rules, Embry was entitled to call Blair as a witness, but he was not entitled to use extrinsic evidence to impeach Blair's testimony on *direct examination* with material in contravention of Rule 608(b).

Additionally, even though Rule 607 allows a party to impeach its own witness—a point Embry stresses throughout his argument—that ability is constrained on direct examination. As discussed above, Rule 608(b)(1) generally

only allows impeachment testimony on cross-examination; however, two situations remain where this testimony may be admitted on direct or redirect examination: (1) where a party already has attacked the credibility of a witness by referring to specific instances of conduct (e.g., during an opening statement), or (2) where a party calling a witness anticipates cross-examination aimed at showing untruthfulness through specific-instances evidence. *See United States v. Jones*, 763 F.2d 518, 522 (2d Cir. 1985) (finding that when defense counsel attacked government witnesses during opening statement, the government was properly permitted to respond via witness testimony during direct examination); *United States v. Medical Therapy Sciences, Inc.*, 583 F.2d 36, 39–40 (2d Cir. 1978) (finding that the key event triggering the applicability of the rule is an "attack" on the witness's veracity; there is a vast difference between putting a witness's veracity in issue by eliciting the impeaching facts and merely revealing the witness's background).

Neither situation is applicable here. It would be unreasonable for Embry to anticipate that the government would seek to introduce evidence of Blair's testimony in the *Henderson* case on cross-examination. In contrast, the situation urged by Embry whereby specific instances of prior misconduct may be inquired into on direct examination, has long been disallowed. *See Bennett v. Longacre*, 774 F.2d 1024, 1027 (10th Cir. 1985) (emphasizing the point: "a party may inquire into specific instances of conduct by extrinsic evidence only on cross-

examination . . . in challenging the truthfulness of [the witness's] testimony"); *see also United States v. Logan*, 121 F.3d 1172, 1175 (8th Cir. 1997) (finding that "[c]ourts must be watchful that impeachment is not used as a subterfuge to place otherwise inadmissible hearsay [evidence] before the jury") (internal quotation omitted).  Accordingly, nothing in this case indicates Embry should fit into one of the narrow grounds of exceptions under Rule 608(b)(1).

In sum, the district court did not err in excluding Blair's *Henderson* testimony.  Since Embry could not question Blair about his involvement with the *Henderson* case directly, he could not generate a statement inconsistent with his trial testimony and thus would have no need or ability to impeach Blair with his testimony as a prior inconsistent statement.

### III.  Conclusion

For the reasons set forth above, we AFFIRM.

Entered for the Court,

Timothy M. Tymkovich
Circuit Judge