FILED
United States Court of Appeals
Tenth Circuit

August 21, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee/Cross-
    Appellant,

v.

MATTHEW CLINE,

    Defendant - Appellant/Cross-
    Appellee.

Nos. 24-1119 & 24-1137

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:21-CR-00339-DDD-1)**
_____

Robert T. Fishman of Ridley, McGreevey & Winocur, PC, Denver, Colorado, for Defendant-Appellant/Cross-Appellee.

Rajiv Mohan, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, and J. Bishop Grewal, Acting United States Attorney, with him on the briefs), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee/Cross-Appellant.

_____

Before **HARTZ**, **KELLY**, and **CARSON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Matthew Cline (Defendant) appeals his convictions for participating in a scheme to defraud the Western Area Power Administration (WAPA). He argues that the district court erred by (1) permitting the government to introduce evidence of a testifying coparticipant's guilty plea as substantive evidence of Defendant's guilt and (2) instructing the jury that it could find the requisite mental state for conviction if Defendant was deliberately ignorant of the fraud. For its part, the government cross-appeals the district court's forfeiture order, contending that the court erred by limiting forfeiture to the six transfers of funds from WAPA to Defendant that were charged in the indictment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Defendant's convictions but vacate and remand the forfeiture order.

## I.    BACKGROUND

WAPA is a government agency within the United States Department of Energy that markets and supplies hydroelectric power generated from federal dams. The agency operated a warehouse in Montrose, Colorado, where it stored supplies used to maintain its electrical grid. Jared Newman was a contract clerk for WAPA who worked at the warehouse. One of his responsibilities was to arrange for purchasing supplies. From 2014 to 2017 he abused this position, defrauding the government of nearly $900,000 by manipulating the warehouse's procurement processes.

The scheme operated as follows: First, Newman would prepare purchase orders for supplies that WAPA ostensibly needed from local vendors associated with his friends and family. The vendors would generate invoices for the ordered supplies,

2

which Newman would submit to WAPA for approval and payment. WAPA managers would then approve and pay those invoices. But the vendors would not provide the purchased supplies to the warehouse. Instead, they would transfer to Newman most of the money they received from WAPA, while keeping a cut of each fraudulent payment as a "commission." R., Vol. III at 682. To avoid raising suspicion, Newman and another warehouse clerk named John Atwood—who was also involved in the scheme as a vendor-company owner—would log the supplies into the warehouse's inventory tracking system as if they had been received.

Defendant was a friend of Newman's and the owner of two of the vendors in the scheme. He received 59 payments from WAPA based on fraudulent invoices that he generated, totaling nearly $180,000. In October 2021 a grand jury indicted Defendant on six counts of wire fraud, *see* 18 U.S.C. § 1343, in the United States District Court for the District of Colorado. Each count corresponded to a single transfer of funds from WAPA to one of Defendant's companies. The indictment sought forfeiture of all proceeds Defendant obtained through the scheme.

Before trial the government indicated that it planned to call Newman, Atwood, and several other coparticipants in the procurement-fraud scheme as witnesses in its case-in-chief. The coparticipants had all pleaded guilty to charges arising from their involvement in the scheme. Defendant filed several motions in limine to preclude the government from introducing evidence of the coparticipants' guilty pleas during their testimony. But the district court denied Defendant's supplemental motion in limine

3

and ruled that the evidence was admissible. The government referred to Atwood's guilty plea twice during his direct examination and twice during closing argument.

Defendant's primary defense was that although Newman defrauded the government, Defendant was not a knowing participant in the fraud. To prove Defendant's knowledge, the government presented evidence that (1) Defendant received $179,314.56 in payments from WAPA (including on invoices for goods that his companies apparently were not even in the business of selling); (2) Defendant wrote checks to Newman kicking back most of the proceeds while pocketing a few hundred dollars for himself on each transaction; and (3) Defendant never provided any of the ordered supplies to the warehouse. The government also presented evidence that Defendant took steps to conceal his involvement in the scheme. He wrote "rent" on the memo line on the kickback checks he wrote to Newman, and he did not use his usual name or phone number when acting on behalf of one of his vendor companies. At the conclusion of testimony the district court instructed the jury that "knowledge can be inferred if the defendant purposely contrived to avoid learning all the facts." R., Vol. I at 872.

Defendant was convicted on all counts. The government sought a preliminary order of forfeiture in the amount of $179,314.56, which was the total amount paid by WAPA to Defendant's companies on 59 fraudulent invoices. The district court sentenced Defendant to four years' probation. It ordered Defendant to pay only $20,268.35 in forfeiture—the sum of the six transfers charged in the indictment. And

it ordered restitution in the amount of $179,314.56,[1] for which Defendant and Newman would be jointly and severally liable.

## II.    DISCUSSION

### A.    Evidence of Coparticipant's Guilty Plea

Defendant argues that the district court erred under *United States v. Peterman*, 841 F.2d 1474, 1479 (10th Cir. 1988), by permitting the government to introduce evidence of Atwood's guilty plea.[2] We disagree.

#### 1.    *Preservation*

At the outset, the government contends that Defendant waived this argument because he did not contemporaneously object when the evidence was introduced and failed to argue plain error on appeal.

But Defendant adequately raised the issue through his pretrial motions in limine. In those motions he sought to exclude "evidence about the guilty pleas of other individuals," including Atwood, contending that this evidence would be improperly used for the primary purpose of proving his guilt, in violation of *Peterman*. R., Vol. I at 792 (capitalization omitted). The district court ruled

---

[1] "Criminal forfeiture and restitution are separate remedies with different purposes." *United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010). "Thus, ordering forfeiture in addition to restitution is not an unfair double recovery." *Id.* at 1248.

[2] Defendant does not challenge the government's introduction of evidence of Newman's guilty plea.

otherwise. It denied Defendant's supplemental motion in limine and concluded that the guilty-plea evidence was admissible, stating:

> I am not convinced that *Peterman* as filtered through subsequent cases bars the government's introductions of the guilty pleas of the co-participants. In light of the nuance and uncertainty over how *Peterman* ought to be applied, at this point I will allow the government to introduce the guilty pleas if it chooses to run the risk that a stronger version of *Peterman* could be applied on appeal.

*Id.* at 806.

A pretrial motion in limine "may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge." *United States v. Williams*, 934 F.3d 1122, 1132 (10th Cir. 2019) (internal quotation marks omitted). Here, each prong was satisfied.

First, as the government concedes, this issue was fairly presented to the district court in Defendant's pretrial motions and the government's response to Defendant's initial motion in limine.

Second, the issue could be finally decided in a pretrial hearing. Although it is not uncommon for a trial judge to wait to see the context develop at trial, the context may be sufficiently apparent to make a pretrial ruling.

Third, the issue was ruled upon without equivocation. Despite what the government argues, the district court's decision to "allow the government to introduce the guilty pleas" was not conditional on the admission or nature of any other evidence. R., Vol. I at 806. The only contingency was whether the

6

coparticipants testified at trial. The government argues that the district court's ruling was equivocal because it qualified its decision by using the phrase *at this point*, "indicat[ing] that its ruling was open to reconsideration." Aplee. Br. at 27. What the district court appears to have been saying, however, is that the guilty-plea evidence was admissible barring an intervening change in the law. The court's acknowledgment that its decision was subject to reversal on appeal was merely the expression of a truism that would apply to even the most categorical rulings of the court. And, perhaps most telling, the district court certainly thought its ruling had been unconditional. When Defendant raised a belated objection to the guilty-plea evidence at trial, the court declared that its pretrial ruling had been definitive, stating "I have already ruled on the admissibility of these [plea] agreements." R., Vol. III at 509.

Defendant's pretrial motions in limine sufficed to preserve his argument on appeal.

### 2.    *Merits*

Because Defendant's argument was preserved, we review his challenge to the district court's evidentiary ruling for abuse of discretion. *See United States v. Bruce*, 127 F.4th 246, 252 (10th Cir. 2025). "Evidentiary rulings may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *United States v. Harper*, 118 F.4th 1288, 1296 (10th Cir. 2024) (internal quotation marks omitted).

It is long-settled that evidence of a codefendant's or coparticipant's guilty plea or conviction "may not be used as substantive evidence of a defendant's guilt." *United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983); *see United States v. Whitney*, 229 F.3d 1296, 1304 (10th Cir. 2000) (recognizing that this rule "appl[ies] to guilty pleas of co-conspirators as well" as codefendants); *Substantive evidence*, *Black's Law Dictionary*, 701 (12th ed. 2024) (defining *substantive evidence* as "[e]vidence offered to help establish a fact in issue, as opposed to evidence directed to impeach or to support a witness's credibility"). The "rule is grounded in notions of fundamental fairness and due process and serves at least two important purposes." *United States v. Woods*, 764 F.3d 1242, 1246 (10th Cir. 2014) (citation omitted). "First, it curbs the jury's temptation to find guilt by association. Second, it helps to ensure the government must prove every element of an offense against the defendant; the government may not borrow proof from another person's conviction." *Id.* (citations omitted).

When the coparticipant testifies, however, evidence of the guilty plea may be properly admitted to assist the jury in assessing credibility. *See id.* The obvious, and most common, use is to undermine the witness's credibility by showing that the witness is a criminal, from which one can infer a tendency to lie. But this evidence may also be introduced to "bolster the witness's credibility." *Id.* For example, the plea may be used to show that the witness is not just trying to deflect blame onto someone else but has acknowledged participating in the described misconduct and

has taken responsibility for it. *See id.* Or it may be used to establish the witness's firsthand knowledge of that misconduct. *See id.* More subtly, the party offering the coparticipant's testimony may also introduce this evidence to blunt any attempt by the opposing party to impeach the witness's credibility by bringing out the negative evidence during direct examination. *See United States v. Davis*, 766 F.2d 1452, 1456 (10th Cir. 1985) (eliciting coconspirator's guilty plea "to blunt defense efforts at impeachment" is a "permissible purpose[]"); James W. McElhaney, *More on Direct Examination*, 8 Litig. 43, 44 (Fall 1981) ("The current bias is in favor of bringing out harmful information rather than leaving it to the other side. Surely that is better than trying to conceal it and having your case seriously harmed. When you bring it out yourself, you can deal with it in your own way, and remove as much of the sting as possible."). Used for these purposes, the evidence is admissible when, as here, the jury is properly instructed not to use the evidence as a ground to infer the defendant's guilt.[3] *See Woods*, 764 F.3d at 1246.

---

[3] The district court provided the following limiting instruction:

### INSTRUCTION NO. 10
### Co-Participants – Plea Agreement

The Government called as witnesses an alleged co-participant in the charged scheme, who was identified in the Indictment. The Government has entered into a plea agreements [sic] with this co-participant, providing a recommendation of a lesser sentence than this participant would otherwise likely receive. Plea bargaining is lawful and proper, and the rules of this Court expressly provide for it.

An alleged co-participant, including one who has entered into a plea agreement with the Government, is not prohibited from testifying.

On the contrary, the testimony of an alleged co-participant may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged co-participant, unless you believe that testimony beyond a reasonable doubt. *The fact that a co-participant has entered a guilty plea to the offense charged is not evidence of the guilt of any other person. The witness's plea agreement may not be used to establish the guilt of this defendant. The fact that the co-participant pled guilty should only be used to assess the co-participant's credibility as a witness.*

R., Vol. I at 861 (emphasis added).

Defendant claims in his reply brief that the limiting instruction applied only to the testimony of Newman, not to that of Atwood. Some aspects of the instruction support that view. The beginning of the instruction refers to the guilty plea of "an alleged co-participant" (singular) "who was identified in the Indictment." *Id.* And the only coparticipant identified in the indictment was "Person-1," *id.* at 29 (internal quotation marks omitted), who was identified in the government's opening statement as Newman, *see id.*, Vol. III at 122. Other parts of the instruction, however, reference multiple coparticipants, which would include Atwood. For example, the title of the instruction contains the word "Co-Participants" (plural), the instruction opens with "The Government called as witnesses" (plural), and at one point the instruction seems to refer to multiple plea agreements ("The Government has entered into a plea agreements [sic] . . . ."). *Id.*, Vol. I at 861.

Moreover, the district court appeared to be under the impression that the instruction applied to Atwood. When the court presented counsel with its final jury instructions, the prosecutor (apparently forgetting that Newman was also a government witness) said, "one minor thing, Instruction Number 10 refers to co-participants *plural* Plea Agreement. The government only ended up calling John Atwood, and the instruction refers to co-participants as witnesses, plural." *Id.*, Vol. III at 904 (emphasis added). The court responded: "Okay. I will take a look at that. That may involve [Newman] too, I guess, but will see if that still makes sense." *Id.* at 904–05. Defense counsel remained silent during this exchange.

All in all, the language in the instruction was ambiguous, if not inconsistent, concerning what particular person or persons the instruction referred to. But the principle it stated—that a coparticipant's guilty plea could not be used to establish the guilt of Defendant but could be used only to assess the coparticipant's credibility—was crystal-clear.

In any event, any argument that the limiting instruction was inadequate or otherwise improper is waived because Defendant did not object to the instruction

Thus, the question is whether the guilty-plea evidence was introduced for the proper purpose of assessing Atwood's credibility. We think it was.

During his direct examination Atwood testified about his involvement in the procurement-fraud scheme, both in his role as a warehouse clerk who falsely logged supplies into the warehouse's inventory tracking system and in his role as the owner of a vendor used to defraud WAPA.

The construction of the scheme was what is commonly referred to as a hub-and-spoke enterprise. Newman was the central figure (the hub), who had a limited number of helpers (such as Atwood, in his role as a clerk) for the central operation. The "businesses" he conspired with (the spokes, such as Defendant) were largely dealt with independently of one another.

Atwood admitted to engaging in conduct similar to that of which Defendant was accused; namely, he set up a bogus vendor company to generate false invoices and received over $50,000 from WAPA for supplies that were never provided to the warehouse. Atwood also testified that Newman instructed him, as the owner of a vendor, to take steps to conceal his involvement in the fraud. As it was about to conclude its direct examination of Atwood, the government asked whether he had "plead[ed] guilty to theft of government funds" as a result of his conduct.[4] R., Vol. III at 372.

---

below and he failed to challenge the instruction in his opening brief on appeal. *See United States v. Bowling*, 619 F.3d 1175, 1181 n.1 (10th Cir. 2010).

[4] The specific testimony was as follows:

On cross-examination, defense counsel attempted to downplay Atwood's role in the scheme. She suggested that Atwood was simply following Newman's lead and did not fully understand that what he was doing was wrong.[5] She also suggested that

_____

> Q.    Okay. All right. Now, as a result of this conduct of setting up this business [the vendor company], *did you plead guilty?*
> A.    I did.
> Q.    *And did you plead guilty to the—to a felony?*
> A.    I did.
> Q.    *Did you plead guilty to theft of government funds?*
> A.    I did.

R., Vol. III at 371–72 (emphasis added).

[5] Defense counsel asked Atwood the following questions about the extent of his involvement in the scheme:

> Q.    And [Newman] naturally kind of took the lead [in dividing up the warehouse tasks]? . . . He is a much more fast-talking guy than you? R., Vol. III at 375.

> Q.    [Newman], pretty early on, kind of established himself in the warehouse as the guy calling the shots, so to speak? . . . [A]nd he kind of took over your job, as well, right? *Id.* at 380.

> Q.    [Newman] also was the one who said, *Hey, you could make more money through J&S fabrication* [Atwood's vendor company]*, if you started providing stuff to WAPA,* and that's why you had the situation set up . . . right? *Id.* at 382.

> Q.    [Newman] wanted you to sell stuff that WAPA needed to WAPA . . . and that's how you got yourself into a pickle? *Id.*

> Q.    And you were not familiar with doing a distribution kind of business, so [Newman] basically said, *I will do it for you,* right? *Id.*

12

the warehouse was disorganized and that its ability to track inventory was unreliable at best.[6]

---

> Q.   [Newman] ordered stuff and ran it under your business name? *Id.* at 383.
>
> Q.   And you also said, *I didn't think it was wrong at the time*? . . . You wanted to make sure though, that the products were actually coming in, and you did? *Id.*
>
> Q.   You had no information about whether [Newman] was hiding or moving stuff around in—in the warehouse? *Id.* at 384.
>
> Q.   You weren't trained on how to do inventory, right? *Id.* at 386.

[6] Atwood was cross-examined about disorganization at the warehouse as follows:

> Q.   And you talked a little bit about what was going on in the warehouse, and you made it sound like maybe it was a little chaotic?
> A.   At times, it was.
> Q.   People would come in, grab what they needed and take off, basically?
> A.   Correct.
> Q.   They didn't necessarily follow the rules about dotting the Is or crossing the Ts, so that Maximo [the warehouse's inventory-tracking system] could verify that they had taken inventory?
> A.   That's correct.
> Q.   And what would happen if they had followed the rules is that you would be able to say in Maximo, *Okay, engineer A took part B for a specific job*, right?
> A.   Technically, yes.
> Q.   But that very rarely happened?
> A.   Seldom. Very rarely is a good analogy.

R., Vol. III at 373–74.

On redirect the government finished its examination of Atwood by asking whether he had "accept[ed] responsibility" for the misconduct. *Id.* at 389.[7]

In this context, the government's introduction of evidence of Atwood's guilty plea served two proper purposes in anticipating possible impeachment. First, it was reasonable to expect that Defendant might attempt to challenge Atwood's credibility by pointing out that he was a convicted felon. As previously noted, the government could try to tame that evidence by bringing it out itself. *See Whitney*, 229 F.3d at 1306 (government may "anticipate the need to bolster credibility by eliciting testimony regarding the guilty plea on direct examination"). Second, by eliciting that Atwood had pleaded guilty, the government established his "acknowledgement [of his] participation in the offense," helping to bolster his credibility. *Woods*, 764 F.3d at 1246 (internal quotation marks omitted). In particular, Atwood's plea shows that he was not just trying to deflect responsibility onto other people, and it helped rebut defense counsel's suggestion that Atwood was ignorant of the scheme, *see Davis*, 766 F.2d at 1455–56 (after coconspirator witness denied a portion of his involvement in

---

[7] The redirect examination of Atwood concluded as follows:

Q.    At some point did you realize what you were doing was
      wrong?
A.    I—I did.
Q.    And did you accept responsibility for it?
A.    I did.

R., Vol. III at 389.

the conspiracy, evidence of "the information to which [he] had pled" was properly introduced "to show acknowledgement by the witness of participation in the offense"); *United States v. Maroney*, No. 96-1314, 1997 WL 748661, at *1–2 (10th Cir. Dec. 3, 1997) (unpublished) (where defendant challenged coparticipant's "firsthand knowledge [of the mail-fraud scheme] by questioning the degree of [the coparticipant's] involvement and her understanding of" the scheme, evidence of coparticipant's guilty plea was properly introduced to bolster the credibility of her testimony about the scheme).

The government also alluded to Atwood's guilty plea twice during closing argument. In the first instance the government said that Atwood had "admitted to his fraud, admitted his responsibility." R., Vol. III at 945.[8] Second, during its rebuttal closing argument, the government called Atwood a "convicted felon[]," "an admitted

---

[8] During its closing argument the government said:

> I would ask you to consider Mr. Atwood for a second. He came before you. He worked in the warehouse. <u>He admitted to his fraud, admitted his responsibility</u>, but what he did say is, in his particular case, when he started to do his portion of the scheme, he was told by Mr. Newman to go get a phone, at Walmart[], which he did, second phone, had his— instructed by Mr. Newman to have his wife answer it, and make sure your address is not on that invoice, so in no way are you connected to this business. That's important, ladies and gentlemen, because you can see what Mr. Newman did with Mr. Atwood in this case. That makes sense. *Yeah, keep this on the down low; don't let anybody know what's going on.* [Defendant's] version, *No, he never told me to not say anything about it*, does not make sense. Mr. Atwood tells you what was going on here.

R., Vol. III at 945–46 (underlining added).

15

felon," and a "criminal[]." *Id.* at 962.[9] Defendant, however, waived any objection to

these references because he did not object during trial or raise the issue in his

opening appellate brief. *See Bowling*, 619 F.3d at 1181 n.1. In any event, the first

comment served the above-mentioned purposes of showing that Atwood was not

trying to deflect responsibility onto someone else and that Atwood in fact was

knowledgeable of the scheme. And the second reference in the government's

argument was proper rebuttal to the defense's closing argument. The defense had

argued that the warehouse was disorganized—the implication being that the vendors

provided the supplies, but the warehouse failed to take proper inventory. The gist of

the government's response was that the absence of accurate recordkeeping is to be

---

[9] During rebuttal closing the government remarked:

> What did we also hear from defense counsel in this case? . . . [W]e agree with and concede, WAPA was not run to standards that the US taxpayers should expect and count on their government to have. . . . [E]ssentially, their argument is blame the government. Say it's the government's fault. You can't trust the government because the way they operated here. That—that warehouse was in disarray, but there's another factor you have got to keep in mind, and don't reward him for this, part of the overall scheme, who were the two key warehousemen*, two convicted felons*. The foxes were guarding the chicken coop, Fox number one, John Atwood. His responsibility is to keep track of the inventory. *He is an admitted felon*. He was dishonest. Fox number two, Jared Newman. The fact that there's no clear ability to say exactly what was in there is due, in large part, because of their shifty paperwork and their behavior . . . . But the point is, is part of the inability to show exactly what was in or came out of that, was due to two *criminals* who were part of this scheme.

R., Vol. III at 961–62 (emphasis added).

expected in a fraudulent scheme, where the culprits would not want to clearly document their misconduct. In context, we see little chance that the jury would view the government's argument as being that the convictions of the other two men implied Defendant's guilt.

Still, Defendant argues that the government's tactics were more subtle. He contends that even if the guilty-plea evidence was introduced for a proper purpose on its face, it violated the rule set forth in *Peterman*, 841 F.2d at 1479. We cannot agree.

In *Peterman* the defendant was on trial for a second time after his previous wire-fraud conviction was reversed on appeal. *See id.* at 1476. The government called the defendant's codefendant in his first trial to testify about the wire-fraud scheme. *See id.* at 1479. When the former codefendant began to testify favorably to the defendant, the prosecutor impeached the witness with evidence of his prior conviction. *See id.* The defendant argued that the government called the former codefendant "for the sole purpose of impeaching him with evidence of his prior conviction." *Id.* at 1480. He suggested that the government knew all along that the former codefendant would maintain his innocence—just as he had in the previous trial. *See id.* But in a hearing on the defendant's motion for a mistrial after the evidence of the former codefendant's conviction was introduced, the prosecutor and a special agent said that they had "met with [the former codefendant] before trial and expected that [he] would modify his original testimony and admit that he had" participated in the scheme. *Id.* Although in that same hearing the former codefendant

"insisted that he had informed the government that he would not change his story," the district court found the prosecutor and special agent credible and found the former codefendant not credible. *Id.* This court held that "[b]ased on the factual findings by the trial court regarding the relative credibility of the witnesses, we cannot say the court erred in determining that the prosecutor did not call [the former codefendant] with the primary purpose of introducing evidence of his prior conviction." *Id.*

*Peterman* adopted the following rule: "[T]he prosecution may not introduce evidence under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." *Id.* at 1479 (internal quotation marks omitted). In other words, the district court abuses its discretion when it allows the government to introduce evidence of a coparticipant's guilty plea "ostensibly" for a proper credibility purpose but really for the "primary purpose" of offering substantive evidence of the defendant's guilt. *Id.* (emphasis omitted). Thus, in that case the "decisive issue" was "what the government expected [the codefendant] to say." *Id.* at 1480. In particular, if the government knew the codefendant would testify favorably to the defendant, the only reason it could have had to call him as a witness was to elicit his conviction, which would have been improper.

To support his *Peterman* claim, Defendant points to statements that the government made before trial which, he says, show that it intended to introduce the

guilty-plea evidence for the primary purpose of proving his guilt. In both its brief in response to Defendant's initial motion in limine and during a pretrial conference discussing Defendant's supplemental motion in limine, the government explained that it planned to call the coparticipants as witnesses because evidence of their involvement in Newman's scheme was "closely intertwined," R., Vol. I at 570,[10] "overlapping," and "part and parcel" with the evidence of Defendant's involvement in the scheme, *id.*, Vol. III at 71.[11] It stated that because the witnesses would be

---

[10] The relevant portion of the government's brief in response to Defendant's initial motion in limine stated:

> Moreover, evidence in the case as to [Defendant] is *closely intertwined* with evidence about the other [coparticipants]—for example, the packets the credit cardholder verified each month included not just invoices from the defendant's companies, but invoices from the [coparticipants'] companies. The credit card statement near the front of each packet lists all of the charges for that time period to the card. Most monthly statements during the charged timeframe included charges for many of the [coparticipants'] companies. By ordering from multiple local companies each month, Newman and Atwood furthered the fraud so that one local company alone (like [Defendant's]) would not stand out.
>
> Accordingly, it is necessary, at a minimum, to explain to the jury the roles and involvement of the [coparticipants]. Doing so without reference to the consequences of their behavior would be confusing and misleading to the jury. The jury would inevitably wonder why [Defendant] is on trial for similar conduct as six other people who are specifically listed in the indictment. Preventing the government from introducing the fact of each associate's plea "would allow the defense to create a false impression, or the jurors to think that the government was trying to keep something from them." *Anderson*, 532 F.2d at 1230.

R., Vol. I at 570–71 (emphasis added).

[11] The relevant exchange at the pretrial conference went as follows:

testifying to their involvement in the procurement-fraud scheme, it would be confusing to the jury if it seemed that the witnesses had avoided any punishment. Introducing evidence of their guilty pleas was therefore necessary to prevent the jurors from "think[ing] that the government was trying to keep something from them." *Id.*, Vol. I at 571 (internal quotation marks omitted).

We fail to see how these statements somehow exposed the government's true intent to use the guilty pleas as substantive evidence of Defendant's guilt. As we understand the government's explanation, it was saying that (1) each participants'

---

[THE GOVERNMENT]:  [T]he Government's intention is not . . . to use . . . the plea agreements of the cooperators for the very reason the Court says. If they backpedal or disavow a fact about their participation or knowledge that they were involved in this scheme, those plea agreements would be relevant to cross examine them about.

THE COURT: Let me interrupt you. What did [Defendant] have to do with—other than Jared Newman, with any of these other associates? If they had all said no, but [Defendant] had done the exact same thing alleged, what difference would it make?

. . .

[THE GOVERNMENT]: Well, the evidence is *overlapping*, Your Honor. It's intertwined. You gotta understand, what the jury is going to be asked to do is there's two government workers who approved stacks of invoices every month regularly. And in that stack, all of the cooperators' invoices, very voluminous documents along with [Defendant's] document. So, it's interwoven in there, and they paid for each of these people's false invoices.

So, for the jury to know what happened in this case, why these government workers approved this, part of the scheme evidence is going to directly show that this evidence from these other people were *part and parcel* of how Jared Newman was obviously to carry out this scheme.

R., Vol. III at 69–71 (emphasis added).

testimony about the operation of Newman's scheme was relevant because evidence of their participation in the scheme was necessarily intertwined with evidence of Defendant's participation, and (2) once these participants testify to their own criminal misconduct, the jury would want to know if they had faced the same consequences that Defendant was facing for similar misconduct. In particular, they might speculate that the witnesses, whose involvement was greater than that of Defendant, were getting off scot-free. The government therefore needed to inform the jury of their convictions to avoid such confusion and speculation and maintain their credibility. That is a proper purpose for such evidence. *See Davis*, 766 F.2d at 1456 (recognizing that evidence of coparticipant's guilty plea may be used "to dispel the suggestion that the government or its witnesses had something to hide").

Further, the government asserted at trial that its rationale for introducing the evidence was assessing witness credibility. When Defendant raised his belated objection after Atwood's testimony, the government responded: "[T]he reason for introducing . . . the prior guilty plea was how it went to . . . the witness' credibility." R., Vol. III at 507.

We do not read *Peterman* as saying that the trial judge (or an appellate court) has free rein to speculate about what the prosecution's true motive was in eliciting a witness's guilty plea. On the contrary, "courts should find a party called a witness for an improper purpose only where the trial record established *clearly and unequivocally* the circumstances showing an improper purpose existed." *United*

*States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992) (emphasis added); *see also*

*United States v. Clifton*, 406 F.3d 1173, 1185 (10th Cir. 2005) (Hartz, J., concurring)

(recognizing that "Federal evidence law does *not* ask the judge to crawl inside the

prosecutor's head to divine his or her true motivation" (ellipsis and internal quotation

marks omitted)). Perhaps because of the difficulty of this task, this court has never

found error under *Peterman*.

On this record, it is not obvious that the government intended to introduce the

evidence of Atwood's guilty plea, or comment on his plea, for the *primary* purpose of

proving Defendant's guilt. There were several proper purposes for that evidence. We

therefore hold that the district court did not abuse its discretion in admitting the

evidence.

### B.    Deliberate Ignorance

Next, Defendant claims that the district court erred by instructing the jury that

his knowledge of the fraud "can be inferred if [he] purposely contrived to avoid

learning all the facts" of Newman's scheme. R., Vol. I at 872.[12] He asserts that the

---

[12] The instruction stated in full:

**INSTRUCTION NO. 19**
**Knowingly – Defined**

When the word "knowingly" or the phrase "with knowledge" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, *knowledge can be inferred if the defendant purposely contrived to avoid*

instruction was improper because the government failed to present sufficient evidence to support a jury finding of his deliberate ignorance of the fraud.

But we need not decide whether there was sufficient evidence of deliberate ignorance. Defendant does not dispute that there was sufficient evidence to support a conviction "based on his *actual knowledge* of the scheme." *United States v. Hillman*, 642 F.3d 929, 939 (10th Cir. 2011). When a defendant "does not challenge the sufficiency of the evidence on a theory of actual knowledge, our case law precludes reversal of the conviction on the basis of insufficient evidence supporting an alternate theory of deliberate ignorance." *Id.* The general rule is that we will sustain a guilty verdict "when there is sufficient evidence to support a conviction on one theory of guilt on which the jury was properly instructed," even if "there was insufficient evidence to convict on an alternative ground on which the jury was instructed." *United States v. Ayon Corrales*, 608 F.3d 654, 657 (10th Cir. 2010).

The Supreme Court has explained why courts do not set aside verdicts when one of the alternative grounds for conviction is not supported by *sufficient evidence*,

---

*learning all the facts.* Knowledge can be inferred if the defendant was aware of a high probability of the existence of the fact in question, unless the defendant did not actually believe that fact.

Acting in good faith is inconsistent with the intent to defraud. A person who acts on a belief or opinion honestly held is not guilty under the statute merely because that belief or opinion turns out to be inaccurate, incorrect, or wrong.

R., Vol. I at 872 (emphasis added and stray period omitted).

even though reversal is necessary when an alternative ground for conviction is *legally improper*:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence. . . . It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.

*Griffin v. United States*, 502 U.S. 46, 59 (1991) (emphasis and internal quotation marks omitted).

We therefore reject Defendant's deliberate-ignorance argument.[13]

### C.    Forfeiture

There remains the government's cross-appeal of the district court's forfeiture order. "Criminal forfeiture is a punitive measure that forces offenders of certain crimes to disgorge any profits obtained from their criminal activity. Unlike restitution, which compensates victims for their losses, forfeiture compels the

---

[13] Defendant argues in the alternative that this court should decline to follow *Hillman* because it was "wrongly decided." Aplt. Resp. & Reply Br. at 29. As he acknowledges, however, this panel "may not overrule the decision of a previous panel . . . absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Mitchell*, 518 F.3d 740, 752 n.14 (10th Cir. 2008) (internal quotation marks omitted).

offender to surrender money or substitute assets to the government." *United States v. Arnold*, 878 F.3d 940, 942 (10th Cir. 2017) (citation omitted). "[W]e review the district court's forfeiture order as we would any other sentencing determination—that is, we review its legal conclusions de novo and its factual findings for clear error." *Id.* at 942 (internal quotation marks omitted).

Defendant was convicted on six counts of wire fraud. Each count corresponded to a single transfer of funds from WAPA to Defendant listed in the indictment. After the jury rendered its verdict, the government sought $179,314.56 in forfeiture—the sum of all 59 payments from WAPA to Defendant under the scheme. The district court ordered forfeiture under 18 U.S.C. § 981(a)(1)(C), which provides for forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' [as defined in 18 U.S.C. § 1956(c)(7)]." *See United States v. Courtney*, 816 F.3d 681, 685 (10th Cir. 2016) (recognizing that the statutory definition of *specified unlawful activity* includes wire fraud). But the court limited the amount of forfeiture to the sum of the six transfers charged in the indictment ($20,268.35).

On cross-appeal the government contends that the district court erred in limiting the forfeiture amount because all the funds that Defendant obtained under the scheme were "derived from proceeds traceable to" his wire-fraud violations. 18 U.S.C. § 981(a)(1)(C). It says that the court should therefore have ordered forfeiture

25

on all 59 payments from WAPA to Defendant—regardless of whether they were specifically charged as wire transfers in the indictment.

As we understand it, the district court's forfeiture decision relied on two different but related grounds. First, the court stated that ordering forfeiture on the uncharged amounts would be akin to "impos[ing] an additional sentence," which it said must be based on findings by a jury. R., Vol. IV at 70. Second, the court reasoned that the government could not meet its burden to show that the funds from the uncharged transactions were "derived from proceeds traceable to a violation," since those transactions were never found to be unlawful. *Id.* Defendant does not defend either ground on appeal. Neither do we.

To begin with, the Supreme Court has held that "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection," and thus the facts underlying a criminal forfeiture need not be found by a jury. *Libretti v. United States*, 516 U.S. 29, 49 (1995); *see United States v. Leahy*, 438 F.3d 328, 331 (3d Cir. 2006) (en banc) ("As to forfeiture, based upon the Supreme Court's decision in *Libretti* . . . , we conclude that the amount a defendant must forfeit also need not be admitted or proved to a jury beyond a reasonable doubt."). The forfeiture amount may be found by a judge and need only be "supported by a preponderance of the evidence." *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012).

To be sure, *Libretti* was not the Supreme Court's last word on the Sixth Amendment. In particular, in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Court held that the Sixth Amendment requires a jury to find beyond a reasonable doubt any fact (other than the fact of a prior conviction) "that increases the penalty for a crime beyond the prescribed statutory maximum." And in *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012), the Court extended "the rule of *Apprendi* . . . to the imposition of criminal fines." It reasoned that "requiring juries to find beyond a reasonable doubt facts that determine the fine's maximum is necessary to implement *Apprendi*'s animating principle: the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense." *Id.* at 350 (internal quotation marks omitted). But *Southern Union* recognized that there could be no "*Apprendi* violation where no [statutory] maximum is prescribed." *Id.* at 353. And the forfeiture provision applied here, 18 U.S.C. § 981(a)(1)(C), does not impose any maximum limit on the amount of forfeiture. *See United States v. Phillips*, 704 F.3d 754, 769–70 (9th Cir. 2012) (concluding that *Apprendi* and its progeny do not limit forfeiture under § 981(a)(1)(C) because "there is no statutory (or guideline) maximum limit on forfeitures"); *United States v. Dermen*, 143 F.4th 1148, 1228 (10th Cir. 2025) ("*Apprendi* and *Southern Union* do not supplant *Libretti* . . . .").

As for the district court's second concern, the Ninth Circuit explained in *United States v. Lo*, 839 F.3d 777, 793 (2016), that forfeiture turns on the scope of the whole scheme, not just on the specific transfers identified in the indictment:

27

Because the proceeds from a mail fraud or wire fraud offense include funds obtained "as the result of the commission of the offense," and the commission of such a mail fraud or wire fraud offense necessarily includes a fraudulent scheme as a whole, the proceeds of the crime of conviction [under § 981(a)(1)(C)] consist of the funds involved in that fraudulent scheme, *including additional executions of the scheme that were not specifically charged* or on which the defendant was acquitted.

*Id.* (emphasis added).

The other circuits to address the issue have likewise concluded that because each wire-fraud count required "a scheme to defraud" as an essential element,[14] the proceeds traceable to each wire-fraud violation necessarily included *all* the proceeds the defendant obtained through the alleged scheme. *See United States v. Cox*, 851 F.3d 113, 128 (1st Cir. 2017) (concluding that "a court may order forfeiture [under § 981(a)(1)(C)] of the proceeds from uncharged conduct that was part of the same fraudulent scheme alleged in the counts of conviction"); *United States v. Venturella*,

---

[14] To prove wire fraud in violation of 18 U.S.C. § 1343, the government had to establish the following four elements beyond a reasonable doubt, as stated in jury instruction 17:

| | |
|---|---|
| *First*: | the *defendant devised or intended to devise a scheme to defraud*, as alleged in the Indictment; |
| *Second*: | the defendant acted with specific intent to defraud; |
| *Third*: | the defendant used or caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and |
| *Fourth*: | the scheme employed false or fraudulent pretenses, representations, or promises that were material. |

R., Vol. I at 868 (emphasis added).

28

585 F.3d 1013, 1017 (7th Cir. 2009) (defendants were convicted on one count of mail fraud; court held that the amount of the charged mailing, "by itself, does not adequately account for the proceeds obtained from [the defendants'] crime of conviction" because "[t]he plain language of . . . [§] 981(a)(1)(C) along with the expansive definition of 'proceeds' indicates that the statute contemplates the forfeiture of property other than the amounts alleged in the count(s) of conviction"); *see also United States v. Capoccia*, 503 F.3d 103, 117–18 (2d Cir. 2007) (Sotomayor, J.) (indicating that proceeds of uncharged or acquitted conduct may be subject to forfeiture under § 981(a)(1)(C) "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise").

Rather than relying on the grounds suggested by the district court, Defendant raises an alternative argument against increasing the forfeiture. He argues that under the Supreme Court's opinion in *Honeycutt v. United States*, 581 U.S. 443 (2017), we should affirm "the district court's denial of the government's request" for $179,314.56 because forfeiture is limited to the funds that "rested with" Defendant. Aplt. Resp. & Reply Br. at 4 (capitalization and internal quotation marks omitted). In other words, Defendant says that ordering forfeiture on the sum of all 59 transfers would have been improper—regardless of whether the transfers had been found to be unlawful by a jury—because only the money that remained in his possession after he paid the kickbacks to Newman was subject to forfeiture.

29

As the government points out, there is a substantial question whether this issue is properly before us because Defendant did not appeal the forfeiture order. Under the cross-appeal rule an appellee, or in this case a cross-appeal appellee, "may not attack the decree [being appealed] with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary" without cross-appealing. *Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (internal quotation marks omitted); *see Greenlaw v. United States*, 554 U.S. 237, 243–45 (2008) (recognizing that this rule applies in both civil and criminal appeals); 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3904, 284 (3d ed. 2022) (Wright, Miller & Cooper) (explaining that the cross-appeal rule probably has "some value in fostering repose, identifying the issues to be met, shaping the progress of the appeal, and regulating enforcement of the judgment"). Thus, a cross-appeal is required "to support modification" of a forfeiture judgment. 16AA Wright, Miller & Cooper § 3974.4, 341 (5th ed. 2020); *United States v. Bajakajian*, 84 F.3d 334, 338 (9th Cir. 1996), *aff'd*, 524 U.S. 321 (1998) (defendant-appellee's failure to file cross-appeal requesting modification of forfeiture order barred appellate court from vacating order); *cf. United States v. Craven*, 239 F.3d 91, 97 (1st Cir. 2001) ("[A] criminal defendant, *qua* appellee, may not seek a reduction in his sentence without having filed a cross-appeal.").

At the same time, however, an appellee who does not take a cross-appeal "may urge in support of a decree any matter appearing in the record, although his argument

may involve an attack upon the reasoning of the lower court." *Jennings*, 574 U.S. at 276 (internal quotation marks omitted). The appellee may even raise an argument that could justify a modification of the lower-court decree that would benefit the appellee, so long as the appellee does not seek that relief but raises the argument only to preclude modifications that the appellant seeks. Such arguments "should be entertained" to the extent that they "seek to support a . . . judgment on different grounds, even though cross-appeal rules may require rejection of the *additional relief that logically follows* from the new grounds." 15A Wright, Miller & Cooper § 3904, 285 (emphasis added); *see id*. at 284–85 (The cross-appeal rule requires "flexible administration" when, as here, the non-appealing party makes arguments "that can be limited to support of the judgment *but that logically would require modification*." (emphasis added)). The treatise provides a helpful illustration: A plaintiff-appellant seeks an increase in an attorney-fee award on appeal and the defendant-appellee, without cross-appealing, argues that no fee award should have been made in the first place. *See id.* Under these circumstances, the fee award "cannot be reversed without cross-appeal." *Id.* But the defendant-appellee's "argument that no award was proper . . . should be accepted *to the extent that it simply defeats an increase that otherwise might seem appropriate.*" *Id.* (emphasis added).

Defendant's contention in this case stays within proper bounds. Although his argument—that the forfeiture should not include the kickback amounts—might justify or even logically compel a reduced forfeiture amount, he does not request a

decrease in the judgment against him. Instead, he contends that the forfeiture order *cannot be increased*. Such an argument "seeks to preserve" the status quo. *Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 364 (1994). Defendant is in a position similar to that of the defendant-appellee in the above illustration. And the Ninth Circuit has come to essentially the same conclusion. *See Bajakajian*, 84 F.3d at 330 (allowing defendant to argue against the government's obtaining a *larger* forfeiture amount, but prohibiting defendant from using the same argument to set aside the forfeiture order altogether because he did not cross-appeal). We therefore review the merits of Defendant's *Honeycutt* argument, although we determine that it fails.

In *Honeycutt* the Supreme Court considered whether under 21 U.S.C. § 853(a)(1) "a defendant may be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." 581 U.S. at 445; *see* 21 U.S.C. § 853(a)(1) (providing for forfeiture of "any property constituting, or derived from, any proceeds the person *obtained*, directly or indirectly, as the result of" certain drug crimes (emphasis added)). The defendant in that case, Terry, worked at a store owned by his brother that unlawfully sold a product used to make methamphetamine. *See* 581 U.S. at 445. After both brothers were convicted of crimes relating to the sale of the product, the government sought from Terry forfeiture of the store's illicit profits from selling the product, even though he "was a salaried employee who had not personally received any profits

32

from" the sales. *Id.* at 446. The Court applied the common dictionary definition of *obtain* to mean "to come into possession of or to get or acquire." *Id.* at 449 (internal quotation marks omitted). Reading the statutory provision in this context, it concluded that Terry could not be held liable for the illegal profits because "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself *actually acquired* as the result of the crime." *Id.* at 454 (emphasis added).

We recognize that "a circuit split has developed over whether Honeycutt applies to a forfeiture under 18 U.S.C. § 981(a)(1)(C)," which does not use any form of the word *obtain*. *United States v. Channon*, 973 F.3d 1105, 1115 (10th Cir. 2020). We need not choose a side, however, because even if *Honeycutt* applies to § 981(a)(1)(C), the government prevails.

We do not read *Honeycutt* to say that a defendant who actually possessed or acquired the full amount of proceeds under a criminal scheme cannot be held liable for funds later transferred. The other circuits to have considered the question largely agree. *See United States v. Tanner*, 942 F.3d 60, 67–68 (2d Cir. 2019) (holding that defendant who wired $9.7 million to codefendant who had assisted defendant in defrauding codefendant's employer could properly be ordered to forfeit the $9.7 million under 18 U.S.C. § 982(a)(1), explaining, "Honeycutt's bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes. But when each co-conspirator acquired the full proceeds as a result of the crime, each can still be held liable to

33

forfeit the value of those tainted proceeds, *even if those proceeds are no longer in his possession because they have been dissipated or otherwise disposed of by any act or omission of the defendant*." (emphasis added; citations and internal quotation marks omitted)); *United States v. Young*, 108 F.4th 1307, 1325–28 (11th Cir. 2024) (holding that *Honeycutt* did not bar forfeiture under 18 U.S.C. § 982(a)(7) of full amount of proceeds received under scheme where defendant "temporarily controlled all the illicit funds and distributed a portion of them to one of her co-conspirators"); *United States v. Bradley*, 969 F.3d 585, 589 (6th Cir. 2020) (holding that *Honeycutt* did not preclude forfeiture under 21 U.S.C. § 853(a) of full amount of proceeds defendant "came in possession of or got or acquired," "no matter their eventual destination" (brackets and internal quotation marks omitted)); *Saccoccia v. United States*, 955 F.3d 171, 175–76 (1st Cir. 2020) (concluding that *Honeycutt* did not limit defendant who wire-transferred fraud proceeds from bank account he controlled from being liable in forfeiture under 18 U.S.C. § 1963(a)(3) for full amount passing through the account). *But see United States v. Thompson*, 990 F.3d 680, 691 (9th Cir. 2021) (holding that under *Honeycutt*, forfeiture under 18 U.S.C. § 981(a)(1)(C) may reach only proceeds that "came to rest" with the defendant regardless of whether he "at some point had physical control" of all the money).

It is undisputed that Defendant obtained the full amount of each payment from WAPA. Persuaded by the reasoning reflected in the great weight of authority, we reject Defendant's argument. We hold that even though Defendant transferred a large

34

portion of his proceeds to Newman shortly after receiving them, he still is subject to forfeiture on the total amount of the received funds. *See Bradley*, 969 F.3d at 589 (recognizing that whether the defendant "chose to reinvest [the money] in the conspiracy's overhead costs, saved it for a rainy day, or spent it on wine, women, and song" does not limit forfeiture under *Honeycutt* (internal quotation marks omitted)).

### III.    CONCLUSION

We **AFFIRM** Defendant's convictions. We **VACATE** the district court's forfeiture order and **REMAND** for further proceedings consistent with this opinion.